IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ANITA L. HARRIS, | )  Civil No.: 3:12-cv-00395-JE |
| | ) |
| Plaintiff, | )  FINDINGS AND |
| | )  RECOMMENDATION |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

Alan Stuart Graf
Alan Stuart Graf P.C.
316 Second Rd
Summertown, TN 38483

    Attorney for Plaintiff


S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902


FINDINGS AND RECOMMENDATION - 1

Richard Rodriguez
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

Scott T. Morris
Social Security Administration
1301 Young Street, Suite A702
Dallas, TX 95202

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Anita Harris brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for Disability Income Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act).  Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, the Commissioner's decision should be affirmed.

## **Procedural Background**

Plaintiff filed applications for DIB and SSI on March 18, 2008, alleging that she had been disabled since July 27, 2004, because of a cervical spine impairment, an unsuccessful back surgery, and severe back pain.[1]

After the applications had been denied initially and upon reconsideration, Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).  On July 19, 2010, a hearing was held before ALJ James Yellowtail.  Plaintiff and Jaye Stutz, a Vocational Expert (VE) testified at the hearing.

---

[1]At the hearing, the ALJ noted that Plaintiff had filed earlier applications for DIB and SSI which were denied in 2006.  Plaintiff's counsel asked that these applications be reopened.

In a decision filed on August 19, 2010, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  That decision became the final decision of the Commissioner on August 16, 2011, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born on December 31, 1974.  She was 29 years old on the date of her alleged onset of disability, and was 35 years old at the time of the hearing before the ALJ.  She completed the 10th grade, learned to weld in the Job Corps, and has past relevant work experience as a welder.   Plaintiff has not worked since 2004. [2]

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

---

[2]Plaintiff worked for a few days in 2007, but not enough constitute substantial gainful activity.

FINDINGS AND RECOMMENDATION - 3

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

FINDINGS AND RECOMMENDATION - 4

At Steps One through Four, the burden of proof is on the claimant. <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

## **Medical Record**

On June 23, 2004, Plaintiff was seen at an urgent care facility after reportedly being hit on the side of the head by a heavy piece of metal.  Plaintiff reported ongoing significant neck pain following the accident.

Dr. David Mitchell, who was Plaintiff's primary care physician for several years, saw Plaintiff on September 13, 2004.  Dr. Mitchell noted that Plaintiff complained of persistent neck pain, had been evaluated by a neurologist, and had been referred for physical therapy.  Plaintiff was using duragesic patches, and was taking percocet and soma for her pain.  Dr. Mitchell discontinued the patches and recommended that Plaintiff continue physical therapy and chiropractic care.  He noted that facet injections would be "pursued" if Plaintiff's pain continued.

In his notes of a visit on September 20, 2004, Dr. Mitchell indicated that Plaintiff had discontinued duragesic patches and percocet, and was doing much better.  He opined that, if she continued to improve, Plaintiff would be able to return to perform light duty, part-time work within four to six weeks.

On October 4, 2004, Dr. Mitchell released Plaintiff to unrestricted work, four hours per day.  During a visit on October 18, 2004, Plaintiff told Dr. Mitchell that she continued to improve, but had not returned to work because her employer had no part-time work available.  Dr. Mitchell opined that Plaintiff's neck strain was resolving, and continued to restrict her to four hours of work per day.

In a visit to Dr. Mitchell on November 8, 2004, Plaintiff continued to complain of neck pain.  Dr. Mitchell observed that Plaintiff's improvement "seemed to have plateaued," and noted that an MRI taken several months earlier had "apparently revealed disc disease and some neural impingement."  He prescribed Mobic, and opined that Plaintiff should reconsider spinal injections if this did not "help rapidly."  Dr. Mitchell added that he would start referral to a pain relief specialist, because this assistance would likely be needed.

During a visit on December 6, 2004, Plaintiff reported significant neck pain and stiffness.  Dr. Mitchell opined that, because her employer would not provide part-time modified work, it might be necessary to release Plaintiff to full-time, unrestricted work for a few days to evaluate her response.  He indicated that he would defer doing so until Plaintiff had seen a pain specialist.

On January 4, 2005, Plaintiff told Dr. Mitchell that she had recently seen Dr. Kim, a pain specialist, and that he had recommended that she receive steroid injections if blood tests showed she had no bleeding disorder.

During a visit to Dr. Mitchell on February 1, 2005, Plaintiff reported that her insurance provider had not authorized steroid injections, and said she had not tolerated oxycodone that Dr. Kim had prescribed.

During a visit on March 2, 2005, Plaintiff told Dr. Mitchell that she continued to experience significant neck pain, and that the part-time work to which she had been released was not available.  She also reported that she had undergone an independent medical examination (IME).[3]  Dr. Mitchell assessed persistent cervical thoracic injury and continued Plaintiff's release to part-time work.

---

[3]The administrative record does not include a copy of this IME report.

FINDINGS AND RECOMMENDATION - 6

In his notes of a visit on March 16, 2005, Dr. Mitchell indicated that Plaintiff was taking soma three or four times a day and was taking vicodin two or three times a day. Dr. Mitchell reviewed the IME that Plaintiff had undergone a short time earlier, and disagreed with the examiner's conclusion that Plaintiff could work without restrictions. He noted that Plaintiff's work as a welder required Plaintiff to wear a helmet that weighed "several pounds," and to "flip the visor several hundred times a day." Dr. Mitchell opined that this was "a problematic task even without a neck injury." Dr. Mitchell recommended a "vocational intervention" to determine what other jobs Plaintiff might be able to perform "with her ongoing disability."

During a visit on April 13, 2005, Plaintiff reported persistent cervical-thoracic pain and discomfort in her shoulders and upper arms. Dr. Mitchell recommended that Plaintiff receive physical therapy twice per week and undergo a nerve conduction study.

On May 11, 2005, Dr. Mitchell noted that Plaintiff reported persistent cervical thoracic pain and stiffness, and said that she missed her work as a welder. A physical capacities evaluation (PCE) was scheduled in order to assess Plaintiff's capacity for work. Dr. Mitchell again recommended that a nerve conduction study be carried out and that Plaintiff receive spinal injections to treat her ongoing pain.

During a visit on June 15, 2005, Plaintiff told Dr. Mitchell that chiropractic care she was receiving twice per week was helping control her pain, but that she continued to take Darvocet, Ibuprofen, Soma, Xanax, and phenegran. Dr. Mitchell reviewed the results of Plaintiff's PCE, which he noted had indicated that Plaintiff "was capable, at best, of light duty only." Dr. Mitchell observed that Plaintiff had experienced very little change in her condition during the previous several months, and opined that she might be medically stationary. He added that, because Plaintiff would not be able to return to her previous work as a welder, a "vocational

assessment and intervention should start now."

In his notes of a visit on July 13, 2005, Dr. Mitchell indicated that Plaintiff was "doing well," but continued to have a "stiff sore neck."  He recommended that Plaintiff continue to receive chiropractic treatment, and that she receive spinal injections, which would have "both a diagnostic and a therapeutic advantage."  Dr. Mitchell opined that injections might help determine  the "exact cause" of Plaintiff's pain, and that it was "remotely possible" that they would provide enough relief that Plaintiff could return to work.

During a visit on August 29, 2005, Plaintiff reported that chiropractic "trigger point treatment" had given her a headache and caused her to vomit, and had increased the pain in her neck and shoulder.  Because Plaintiff was experiencing significant digestive problems, Dr. Mitchell thought it was unlikely that she would be given spinal injections.

In his notes of a visit on September 6, 2005, Dr. Mitchell indicated that Plaintiff was scheduled to see Dr. Kim, a pain specialist, the following day.  He opined that, if spinal injections were not administered, "for all practical purposes, she would be medically stationary." After Plaintiff saw Dr. Kim, Dr. Mitchell asked Plaintiff's insurer to authorize spinal injections.

In a visit to Dr. Mitchell on October 20, 2005, Plaintiff reported that she had "finally had her initial injections," and that they had reduced her pain.  Dr. Mitchell recommended that Plaintiff  receive additional spinal injections, and noted that she was considering an epidural injection as well.  However, notes of a visit on November 28, 2005, indicated that plans for further injections had been cancelled because of concerns about a bleeding disorder, and that Dr. McCluskey, a pain specialist, was unwilling to administer additional injections until Plaintiff was evaluated by a hematologist.  Dr. Mitchell noted that "some sort of nerve ablation procedure is contemplated by pain management."

On December 25, 2005, Plaintiff went to an emergency room with complaints of a severe migraine. She reported that she felt much better after receiving six trigger point injections. During a visit a few days later, Dr. Mitchell prescribed lidoderm patches. Plaintiff later reported that these provided some relief.

On January 15, 2006, Plaintiff went to an emergency room with complaints of severe neck, shoulder, and head pain. She reported improvements after receiving trigger point injections. In his notes of an office visit on January 19, 2006, Dr. Mitchell opined that Plaintiff was likely experiencing neuropathic pain caused by some mechanical, inflammatory, or other neuropathic process. He opined that nerve ablation would not be "curative," but might provide longer-lasting relief than had been provided by spinal injections.

An MRI of Plaintiff's neck and shoulder taken on January 20, 2006, revealed:

-narrowing at C3-C4 due to endplate osteophytes and bulging disc material;

-mild foraminal narrowing and a minimal disk bulge at C4-C5;

-a left paracentral disk bulge flattening the left half of the spinal cord and narrowing the left foramen, greater than the right, at C5-C6;

-a mild disk bulge that narrowed the thecal sac with mild flattening of the spinal cord at C6-C7; and

-a disk bulge that mildly flattened the spinal cord at C7-T1.

Based upon these results, Dr. Mitchell thought surgery was appropriate.

In his notes of a visit on February 14, 2006, Dr. Mitchell indicated that Plaintiff had undergone another IME. He stated that he disagreed with the findings concerning the onset location of Plaintiff's neck pain. He indicated that Plaintiff had experienced neck pain before her injury, and stated that, since her injury, she had experienced "slow progressive deterioration, both clinically as well as MRI."

FINDINGS AND RECOMMENDATION - 9

During a visit to Dr. Mitchell on March 7, 2006, Plaintiff reported that her pain was worsening, though she was taking more percocet.  Dr. Mitchell gave Plaintiff samples of Lyrica. During a visit the following week, Plaintiff reported that this medication helped control her "severe discomfort."

During a visit on April 6, 2006, Plaintiff reported that pain in her left arm was worsening. Dr. Mitchell noted that plans for surgery were "in limbo," and indicated that he would request additional injections.  In notes of a visit on April 27, 2006, Dr. Mitchell indicated that Lyrica temporarily relieved Plaintiff's pain, but that Plaintiff's insurance company had denied coverage for that medication.  He diagnosed a chronic neck strain, a herniated disc, and radiculopathy, and opined that Plaintiff's condition would not change substantially until Plaintiff had undergone surgery.

On May 2, 2006, Plaintiff went to an emergency room with complaints of weakness in her left arm and pain in her neck.  She was given percocet and discharged.

In his notes of a visit two days later, Dr. Mitchell stated that he hoped and expected that the disc herniation in Plaintiff's back would "be accepted by work comp" and that Plaintiff would "proceed to surgery."  He added that, without surgery, it was "unclear what other options she may have."

During a visit on May 23, 2006, Plaintiff reported that percocet provided temporary relief.  Dr. Mitchell prescribed a Medrol pack to help control her pain.  On June 20, 2006, Plaintiff reported that her condition had not improved or deteriorated.  Dr. Mitchell opined that Plaintiff could not work because of "ongoing pain," and recommended "vocational intervention."

Dr. Thomas Rosenbaum, a neurosurgeon, performed an IME on June 19, 2006.  Dr. Rosenbaum primarily addressed the question whether Plaintiff's impairments were related to her

industrial accident in 2004.  He noted no stiffness in Plaintiff's neck, but observed decreased range of motion in all aspects of her cervical movement.  He also noted that Plaintiff's MRI's showed that her condition had worsened over time.  Dr. Rosenbaum stated that Plaintiff presented with "diffuse symptomatology with some symptoms which may be compatible with left C6 radiculopathy from the disc abnormality but a significant functional overlay."  He opined that Plaintiff's  medical condition "would preclude repetitive heavy bending, lifting, twisting, and allow for postural changes of the cervical spine."

In his notes of a telephone conversation with Plaintiff's attorney on August 21, 2006, Dr. Mitchell indicated that Dr. Francisco Soldevilla, a neurosurgeon, had concluded that surgery was appropriate for Plaintiff's herniated disc.  In his notes of Plaintiff's visit the following day, Dr. Mitchell stated that, even if surgery was successfully performed, Plaintiff might not be able to return to her previous work, and she should consider other options.

During a visit to Dr. Mitchell on October 24, 2006, Plaintiff reported that her neck pain persisted without change.  Dr. Mitchell indicated that he hoped that surgery would substantially lessen Plaintiff's pain, and opined that the only other option was to treat Plaintiff "in a chronic pain manner."  On October 30, 2006, Plaintiff went to an emergency room with complaints of difficulty  urinating.  Dr. Mitchell opined that this was evidence that Plaintiff's herniated disc was worsening.

In his notes of a visit on November 21, 2006, Dr. Mitchell indicated that he disagreed with Dr. Rosenbaum's conclusion that  a disc in Plaintiff's neck was not herniated as a result of her injury.  Dr. Mitchell stated that disc damage could take months or years to become evident.

Another MRI of Plaintiff's cervical spine was taken on November 24, 2006.  Dr. Mitchell thought it showed the same condition as the previous MRI.  Plaintiff was scheduled for cervical surgery, which Dr. Soldevilla  performed in late December, 2006.

In his notes of a visit on January 11, 2007, Dr. Mitchell expressed concern about the amount of pain medications and sedatives Plaintiff was taking following her surgery.  On January 29, 2007, he noted that Plaintiff had passed out and been taken to an urgent care center a few days earlier after taking several pain medications "close together."  Dr. Mitchell characterized Plaintiff's neck injury as "resolving" following surgery, and stated that Plaintiff was "taking [an] amazing amount of sedatives but apparently needs them for sleep."  He added that Plaintiff's medications would "presumably" be reduced during the upcoming few weeks.

During a visit on February 23, 2007, Plaintiff told Dr. Mitchell that she was doing much better, and that Dr. Soldevilla, who had performed her surgery, was happy with her progress.  Dr. Mitchell noted that Plaintiff's pain seemed to be slowly resolving, and that her mobility seemed to be improving.  He recommended that Plaintiff slowly reduce her "medication load" as she improved.

In his notes of a visit on March 21, 2007, Dr. Mitchell indicated that Plaintiff had reduced her use of percocet and had stopped taking Xanax.  Plaintiff told him that she was slowly improving and was "contemplating return to work."

During a visit on April 30, 2007, Plaintiff reported that her pain was under better control, and asked Dr. Mitchell to reduce her medications.  Dr. Mitchell opined that it was unlikely that she would be able to stop taking pain medications altogether.

During a visit on July 31, 2007, Plaintiff told Dr. Mitchell that she was doing better than she had the previous year, but that she continued to experience morning pain and discomfort.

FINDINGS AND RECOMMENDATION - 12

In his notes of a visit on August 8, 2007, Dr. Soldevilla indicated that post-surgery x-rays showed some fusion at C6-7, but none at C5-6.  He prescribed a bone growth stimulator, and opined that C5-6 would have to be surgically re-fused if that did not produce substantial bone growth.

On December 10, 2007, Dr. Soldevilla noted that an x-ray continued to show non-fusion at C5-6, despite use of a bone growth stimulator.  Dr. Soldevilla stated that a re-fusion would be required if growth did not occur in the near future.  In a note dated December 12, 2007, Dr. Mitchell opined that further surgery might significantly reduce  Plaintiff's pain.

In a letter  addressed "to whom it may concern" in January, 2008, Dr. Mitchell stated that Plaintiff's surgery had not been entirely successful, and indicated that further surgery might be required.  He stated that Plaintiff had been off work since 2004 because of a work injury, and opined that she would not be able to return to work until January, 2009 "at the very earliest."  He added that eventual return to work depended on a successful surgery and post-surgical recovery, "neither of which is guaranteed."  On January 19, 2008, Dr. Mitchell completed an Agency questionnaire addressing Plaintiff's functional capacity.  Dr. Mitchell indicated that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and could stand/walk for four hours and sit for 4 hours during an 8-hour work day.

During a visit to Dr. Soldevilla on February 7, 2008, Plaintiff reported that she continued to experience neck pain.  Dr. Soldevilla referred Plaintiff for a follow-up CT scan and noted that further surgery might be needed if additional growth did not occur at the fusion.  A CT scan performed that day showed stable appearance, preserved vertebral heights, and anatomic alignment.  It also indicated "some degree of bony fusion."

FINDINGS AND RECOMMENDATION - 13

In a letter to Plaintiff's counsel dated December 4, 2008, Dr. Mitchell opined that Plaintiff was "permanently unable to work at any practical occupation."

In a letter to Plaintiff's counsel dated March 12, 2009, Dr. Soldevilla stated that Plaintiff had been unable to return to work when he had last seen her.  Dr. Soldevilla opined that Plaintiff probably would never be able to return to her former work, and would likely have difficulty working full-time in any normal competitive work environment.

Dr. David Silvestri began treating Plaintiff in October, 2009.   In an impairment questionnaire dated June 17, 2010, he diagnosed cervical disc degeneration, chronic neck pain, and migraine headaches caused by neck pain.  He reported that Plaintiff had decreased range of cervical motion, experienced chronic pain, and fatigued easily with exertion.  Dr. Silvestri stated that Plaintiff's condition was not expected to improve with time.

Dr. Silvestri opined that, during an eight-hour work day, Plaintiff could sit for a maximum of 1 hour and could stand and walk less than one hour.  He opined that Plaintiff would not be able to perform work that required her to maintain her neck in a constant position.

## **Testimony**

### **Plaintiff**

Plaintiff testified as follows at the hearing before the ALJ:

Plaintiff's body was "fairly well broken down" since her injury, and her condition has worsened over time.  She cannot work full time.  Approximately two times a week she has severe migraine headaches which last for two or three days.  Plaintiff  needs to sit, then stand, and then lie down because of pain in her neck, left shoulder, left arm, and low back.  Every day she has neck pain which radiates into her upper shoulder and left arm, and her left arm becomes numb and weak.  Plaitniff's pain level is extreme during 10 to 12 days per month.

FINDINGS AND RECOMMENDATION - 14

Plaintiff can lift 5 to 10 pounds, and can stand about 15 to 20 minutes every other day. She occasionally cooks, and is able to wash her own laundry, which her stepfather carries for her.

On a typical day, after she awakens, Plaintiff determines whether she can get up and move around or whether she needs to stay in bed. She takes Ibuprofen, Gabapentin, Amitriptyline, and medicine for migraines.

Plaintiff eats only once per day, and cooks enough for 2 to 3 days at a time. She sleeps 4 to 5 hours per night. She does not sleep continuously, and wakes up with pain and spasms. Amitriptyline interferes with Plaintiff's eyesight, and she cannot read or work with a computer for 6 or 7 hours after taking that medication.

**Lay Witness Testimony**

Terry Collins, Plaintiff's friend and roommate at the time, submitted a third party functional report dated March 28, 2008, describing Plaintiff's activities as follows: Because of constant pain, Plaintiff did as little as possible. Plaintiff was able to manage her personal care and grooming without assistance, and did not need to be reminded to take her medications. Because standing was uncomfortable, she rarely prepared her own meals. Plaintiff could not drive, and rarely went shopping. Other than leaving her apartment for appointments with doctors, Plaintiff rarely went out. She no longer went camping and fishing, and could no longer socialize on a regular basis. Plaintiff was afraid to be around others because she was concerned about re-injuring her neck or having her pain worsen. Plaintiff had been independent and outgoing before she was injured, and had been "kept unnecessarily medicated and completely controlled" after her surgery.

**Vocational Expert**

FINDINGS AND RECOMMENDATION - 15

The ALJ set out a vocational hypothetical describing an individual of Plaintiff's age, education, and experience, who had the residual functional capacity to perform sedentary work, subject to the following limitations:  She could lift and/or carry no more than 10 pounds; sit for six hours; stand and/or walk for two hours; only occasionally climb stairs and ramps, balance, stoop, kneel and crouch; could not crawl or climb ladders, ropes, or scaffolds; could only occasionally reach overhead bilaterally; needed to avoid concentrated exposure to extreme cold and hazards; and needed to avoid even moderate exposure to vibration.  The VE testified that the individual described could not perform Plaintiff's past relevant work as a welder, but could work as a document preparer, a charge account clerk, or an eyeglass frame polisher.

### ALJ's Decision

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date of her alleged onset of disability.  He noted that Plaintiff had worked for a few days in 2007, but that her employer had "let her go . . . because she was not able to do the work."  The ALJ found that this was an unsuccessful work attempt that did not constitute substantial gainful activity.

At the second step, the ALJ found that Plaintiff had the following "severe"  impairments: cervical spine degenerative disk disease at C3-T1; lumbar spine osteoarthritis and degenerative disk disease; left shoulder mild to moderate degenerative changes of the acromioclavicular joint; obesity, and migraine headaches.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  He found that, except for a period of less than 12 months while she was recovering from fusion surgery, Plaintiff had retained the capacity to perform sedentary exertional level work, subject to the limitations noted above which were set out in the vocational hypothetical posed to the VE.  In reaching this conclusion, the ALJ found that Plaintiff's  statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible.

Based upon the testimony of the VE, at the fourth step, the ALJ found that Plaintiff could not perform her past relevant work as a welder either as she had performed the work, or as it was generally performed.

Based upon the testimony of the VE, at the fifth step of his analysis, the ALJ found that Plaintiff could work as a document preparer, charge account clerk, or eye glass polisher.  Based upon that conclusion, he found that Plaintiff had not been "under a disability" as defined by the Act from the date of her alleged onset of disability  through the date of his decision.

### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Claimants bear the initial burden of establishing disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record,  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process.  Tackett, 180 F.3d at 1098.

FINDINGS AND RECOMMENDATION - 17

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ reopened her claims that had been denied before she brought her pending claims.  She contends that he erred in evaluating her current claims by failing to provide legally sufficient reasons for rejecting the opinions of her treating physicians, failing to sufficiently support his conclusion that she was not wholly credible, and failing to adequately develop the administrative record.

1. **ALJ's Decision to not Reopen Plaintiff's Prior Applications**

As noted above, at the hearing, Plaintiff's counsel asked the ALJ to reopen her earlier applications for benefits, which had been denied in 2006,  before the present claims were filed. The ALJ indicated that he would address that issue in his decision.

In finding that Plaintiff had not been disabled within the meaning of the Act at any time since her alleged onset of disability, the ALJ effectively denied Plaintiff's request to reopen her previous claims.  Plaintiff contends that, because the ALJ referred to evidence that was relevant to her earlier claims, he "*de facto* reopened her prior claims."

FINDINGS AND RECOMMENDATION - 18

If my recommendation that the Commissioner's denial of Plaintiff's claims be affirmed is adopted, the ALJ's denial of Plaintiff's request to reopen her earlier claims will be moot. However, in order to create a full record for any further review, I will briefly note my disagreement with Plaintiff's contention.  As the Commissioner correctly notes, the reopening of prior claims is discretionary, and the denial of a motion to reopen is subject to judicial review only if a Plaintiff makes out a colorable claim that she is entitled to such review based upon the United States Constitution.  See Califano v. Sanders, 430 U.S. 99, 107-09 (1977) (plaintiff entitled to judicial review if constitutional questions at issue); Udd v. Massanari, 245 F.3d 1089-99 (9th Cir. 2001).  Here, Plaintiff has not cited a basis for concluding that she has a right to reopen her earlier claims that is based upon the due process protections arising under the Constitution.  In the absence of an argument based upon the alleged deprivation of a due process right, Plaintiff has waived a claim to a constitutionally-protected right to reopen her prior claims. See, e.g., Rivera v. Railroad Retirement Board, 262 F.3d 1004, 1005) (9th Cir. 2001) (plaintiff waived constitutional due process argument by failing to raise it in opening brief).

2.  **Rejection of Opinions of Plaintiff's Treating Doctors**

Plaintiff contends that the ALJ erred in rejecting the opinions of Dr. Mitchell and Dr. Soldevilla, her treating physicians, and provided no legitimate bases for accepting the contrary opinions of Agency  non-examining doctors.


A. **Evaluating Medical Opinion**

The ALJ is required to consider all medical opinion evidence, and is responsible for resolving conflicts and ambiguities in the medical testimony.  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).  An ALJ is not required to find a physician's opinion as to a

claimant's physical condition or as to the ultimate question of disability conclusive.  Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 2009).  In reviewing an ALJ's decision, the court does not assume the role of fact-finder, but instead determines whether the decision is supported by substantial evidence in light of the record as a whole.  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons, supported by substantial evidence in the record,  for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An ALJ must provide "specific, legitimate reasons . . . based upon substantial evidence in the record" for rejecting opinions of a treating physician which are contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).

## B. Analysis

The opinions of Dr. Mitchell, who was Plaintiff's primary care physician for several years, and Dr. Soldevilla, Plaintiff's treating neurologist, are fully set out above.  If accepted, these doctors' ultimate opinions as to Plaintiff's residual functional capacity would establish that Plaintiff is disabled.

Plaintiff contends that the ALJ failed to provide "legally sufficient analysis" of the opinions of Drs. Mitchell and Soldevilla, improperly gave greater weight to the opinions of a non-examining Agency consulting doctor, and failed to provide either "clear and convincing" reasons or reasons supported by substantial evidence in the record for rejecting these treating physicians' opinions.  Before separately examining the adequacy of the ALJ's reasons for

rejecting the opinions of Drs. Mitchell and Soldevilla, I will briefly address Plaintiff's other arguments, which apply to the ALJ's assessment of the opinions of both of these treating physicians.

Plaintiff contends that the ALJ failed to consider all the evidence as required by 20 C.F.R.§§ 404.1520(3), 416.920(3), and failed to consider medical opinions as required by 20 C.F.R. §§404.1527(b), 416.927(b).  A careful review of the ALJ's decision and the medical record does not support these assertions.   The ALJ thoroughly reviewed the medical record, summarized conflicting evidence, and set out a rational interpretation of the evidence with sufficient clarity to allow for judicial review.  Plaintiff disagrees with the ALJ's conclusions. However, where, as here, the record will support more than one rational interpretation of the evidence, the court must defer to an ALJ's rational decision.  See Morgan v. Commissioner, 169 F.3d 595, 599 (9ᵗʰ Cir. 1999) (if record supports more than one rational interpretation, court defers to ALJ's interpretation).

Plaintiff's assertion that a non-examining medical consultant's opinion does not "by itself" constitute substantial evidence that supports rejection of a treating doctor's opinion is certainly correct.  See  Lester, 81 F.3d at 831.   However, here, the ALJ did not cite the opinions of the Agency non-examining doctors as evidence supporting the rejection of the opinions of Plaintiff's treating physicians, or simply state a preference for the non-examining doctors' opinions.  Instead, he cited a number of reasons for rejecting the opinions of Plaintiff's treating physicians and concluded that, in the absence of support for those opinions, the non-examining doctors' RFC assessments were the "most reasonable" assessment of Plaintiff's functional capacity in the record.  This is different than using the opinions of non-examining doctors as

FINDINGS AND RECOMMENDATION - 21

"substantial evidence that warrants rejection" of the opinions of treating physicians, which is the use of non-examining doctors' opinions criticized in <u>Lester</u> and related decisions.[4]

As noted above, whether the ALJ must support rejection of treating doctors' opinions with "clear and convincing" or "specific and legitimate" reasons turns on whether those opinions are controverted by the opinions of treating or examining doctors. Here, Dr. Rosenbaum, an examining physician, opined that Plaintiff's symptoms reflected a significant functional overlay and concluded that Plaintiff's impairments "would preclude repetitive heavy bending, lifting, [and] twisting . . . ." Dr. Rosenbaum's references to "functional overlay" appears to be inconsistent with the opinions of Drs. Mitchell and Soldevilla, who did not cite functional overlay as a factor in Plaintiff's symptoms or limitations. In addition, Dr. Rosenbaum's reference to Plaintiff's inability to perform certain strenuous work-related activities might imply that he concluded that she could perform lighter work full-time – a conclusion contrary to those ultimately expressed by those treating physicians. Nevertheless, in the absence of an unequivocally stated contradiction between the opinions of Dr. Rosenbaum and those of Plaintiff's treating physicians, I will apply the "clear and convincing" standard to the ALJ's bases for rejecting the opinions of Plaintiff's treating physicians.


**Dr. Mitchell**

The ALJ set out several reasons for giving "little weight" to Dr. Mitchell's opinions. He noted that in January, 2008, Dr. Mitchell both opined that Plaintiff might be able to resume work in 2009 or 2010, and assessed capacities for lifting, sitting, and standing/walking which were

---

[4]The Agency non-examining doctors' conclusion that Plaintiff could perform sedentary work was in fact consistent with limitations assessed by Dr. Mitchell.

consistent with the ability to perform at least sedentary work.  He noted that by December, 2008, when he opined that Plaintiff had been permanently disabled since June, 2004, Dr. Mitchell had not seen Plaintiff for nearly a year.  The ALJ also noted that this opinion was inconsistent with Dr. Mitchell's failure to object to Plaintiff's active search for employment in 2007, and his review of "work options" with her at that time.

The ALJ asserted that Dr. Mitchell's "conflicting opinions" concerning Plaintiff's functional capacity  undermined his credibility, and that "lack of objective medical findings further erodes his credibility."  As examples, he noted that Dr. Mitchell repeatedly referred  to Plaintiff's "radiculopathy" and "neuropathic pain," though he never evaluated  her nervous system or assessed "sensory loss in nerve root distribution."  The ALJ noted that Dr. Mitchell instead related his "neurological evaluations" to his observations that her judgment, mood, memory, and orientation were "normal."  The ALJ asserted that these "mental status evaluations" were "meaningless for neurological purposes."

The reasons the ALJ provided for rejecting Dr. Mitchell's ultimate conclusion that Plaintiff could not work satisfied the "clear and convincing" standard.  Dr. Mitchell's treating records and evaluations include a variety of substantially inconsistent opinions concerning Plaintiff's ability to perform work-related activities and to return to work following her injury. At times Dr. Mitchell released Plaintiff to part time work and opined that a full release might be appropriate, and his repeated recommendation Plaintiff consider other employment options than a return to welding at least imply that he thought she was capable of performing lighter work. The ALJ could reasonably conclude that the inconsistency of these opinions with Dr. Mitchell's ultimate opinion, given when Dr. Mitchell had not seen Plaintiff for nearly a year, undermined the reliability of this treating physician's assessment.

The ALJ correctly noted that Dr. Mitchell had not seen Plaintiff for 11 months when he opined in December, 2008, that she had been disabled since June, 2004.  The frequency of a treating physician's examination of a claimant is relevant in evaluating medical opinion.  E.g., Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).  Moreover,  Dr. Mitchell's conclusion at that time that Plaintiff was disabled was inconsistent with his assessment of Plaintiff's functional capacity at other times while he was actively treating Plaintiff, including his opinion in January, 2008, that she could sit, stand, and walk for the duration required to perform sedentary work. Inconsistencies in a physician's reports are relevant in evaluating a physician's opinion, and the ALJ is responsible for determining whether inconsistencies are material.  Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999).  The ALJ's conclusion that the inconsistencies in Dr. Mitchell's opinions were material was reasonable, given the wide divergence of opinions Dr. Mitchell expressed, and the absence of corresponding objective evidence of a commensurate worsening in Plaintiff's medical condition.

The record also supports the ALJ's observation that Dr. Mitchell's "neurological evaluations" were not based upon objective medical testing, but instead referred to his assessment of her judgment, mood, and orientation.  The ALJ's conclusion that Dr. Mitchell's findings were not useful for neurological purposes is reasonable, and supported the ALJ's rejection of Dr. Mitchell's opinions.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005 (ALJ may reject physician's opinion not supported by clinical notes and findings).

In his thorough review of the medical evidence, the ALJ noted that, though Plaintiff complained of pain, intermittent tenderness and isolated staggering gait between June, 2004 and October, 2006, "physicians' examinations showed the claimant largely had full cervical spine motion with no meningeal signs, no cerebellar, motor, sensory, range of motion or reflex deficits

in any extremity, and normal gait." He noted that "Dr. Mitchell assessed the claimant to have

no more than a resolving neck strain in October 2004," and that "[b]etween June 2004 and

November 2006, conservative modalities of physical therapy, chiropractic adjustments, neck

collar, facet injects, a pain clinic and medications were prescribed." He also noted that Plaintiff

"continued to do well" after her diskectomy and fusion in October, 2006, and that between

January, 2007 and June, 2010, Dr. Mitchell and Dr. Silvestri, her primary care physicians,

consistently found that she was in no acute distress and had normal strength, reflexes and

sensation in her upper extremities. These observations, which are supported by the medical

record, support both the ALJ's ultimate assessment of Plaintiff's RFC and his rejection of Dr.

Mitchell's opinion that Plaintiff could not work.

**Dr. Soldevilla**

As noted above, in a letter to Plaintiff's counsel dated March 12, 2009, Dr. Soldevilla

stated that Plaintiff had not been able to return to work when he had last seen her. He added that

Plaintiff probably would never be able to return to her former work, and would likely have

difficulty working full-time in any normal competitive work environment.

The ALJ correctly observed that Dr. Soldevilla's opinion did not "explicitly or

necessarily" rule out the possibility that Plaintiff could perform work that was less demanding

than her past work as a welder, and accepted Dr. Soldevilla's opinion to the extent that it was

consistent with his own RFC evaluation. In rejecting the ultimate conclusion that Plaintiff

probably could not perform any full time work, the ALJ noted that Dr. Soldevilla had not seen

Plaintiff for 13 months when he expressed that opinion. He noted that, though Dr. Soldevilla had

earlier opined that additional surgery might be needed if necessary bone growth did not occur,

there was no indication that he recommended additional surgery after a CT taken after he last

saw Plaintiff showed that the fusion appeared to be stable, vertebral body heights appeared to be preserved, alignment remained "anatomic," and it appeared that "some degree of bony fusion" had occurred.  The ALJ also concluded that Plaintiff's decision not to seek further treatment from Dr. Soldevilla after February, 2008 indicated that the impairment he treated "resolved adequately in normal course, within a year."

To the extent that Dr. Soldevilla intended to indicate that Plaintiff could perform no competitive employment, these are clear and convincing reasons for rejecting that opinion.  The ALJ asserted that Dr. Soldevilla did not "explicitly or necessarily" rule out performance of work that was less physically demanding than Plaintiff's past work as a welder. I agee: Dr. Soldevilla stated that Plaintiff would likely "have difficulty" performing full time work, but did not definitively assert that she could not perform any full time work.  The test for disability is not whether a claimant might "have difficulty" performing jobs that exist in substantial numbers in the national economy, but whether they are in fact able to perform such work.

As noted above, the frequency of a treating physician's examination of a claimant is relevant in evaluating medical opinion.  Here, the ALJ correctly noted that Dr. Soldevilla provided the opinion upon which Plaintiff relies more than a year after after he had last seen her. In addition, the ALJ correctly noted that Dr. Soldevilla had been concerned earlier that further surgery might be needed if bone growth did not occur at the fusion site.  The ALJ reasonably concluded  that additional surgery had not been needed because a subsequent CT scan indicated that some degree of fusion was occurring, there was no indication that Dr. Soldevilla subsequently recommended further surgery, and Plaintiff had not returned for treatment after February, 2008.

To the extent that Dr. Soldevilla may have intended to opine that Plaintiff could not sustain competitive employment, the ALJ provided legally sufficient reasons to reject that conclusion.  Dr. Soldevilla provided no functional analysis of Plaintiff's ability to perform work-related activities.  As the Commissioner correctly notes, under these circumstances, his opinion as to Plaintiff's ability to work was not in fact a medical opinion, but a vocational opinion that addressed an area that is reserved for the Commissioner.  See Harman v. Apfel, 211 F.3d 1172, 1189 (9th Cir. 2000); Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003) (doctor's opinion as to whether claimant could work was not "medical opinion" within meaning of relevant regulations).

**Dr. Silvestri**

In the portion of her opening memorandum addressing the ALJ's rejection of the opinions of her treating physicians, Plaintiff makes no reference to Dr. Silvestri, the last of her primary physicians noted in the medical record.  However, in a later section of her memorandum captioned "The ALJ Failed to Satisfy His Duty to Develop the Record," she notes that the ALJ rejected Dr. Silvestri's opinion and contends that the ALJ should have further developed the record by obtaining Dr. Silvestri's treatment records.

Because she has not directly addressed the ALJ's rejection of Dr. Silvestri's opinion, and has offered no arguments supporting any contention that the ALJ erred in rejecting this doctor's opinion, Plaintiff has waived any argument that the ALJ improperly rejected Dr. Silvestri's opinion.  See, e.g., Carmickle v. Commissioner, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (courts will not consider matters on appeal not specifically argued in opening brief).  Accordingly, I will address below Plaintiff's contention that the ALJ failed to adequately develop the record because he did not obtain Dr. Silvestri's records, but will not address the sufficiency of the ALJ's reasons for rejecting this doctor's ultimate opinion.

3. **Plaintiff's Credibiltiy**

As noted above, the ALJ found that Plaintiff's  statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible.

**Standards for Evaluating Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).  If substantial evidence supports the ALJ's credibility determination, that determination must be upheld, even if some of the reasons cited by the ALJ are not correct.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

The ALJ must examine the entire record and consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  SSR 96-7.   An ALJ may also consider such factors as a claimant's prior inconsistent statements concerning her symptoms and other statements that appear less than candid, unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, medical evidence tending to discount the severity of the claimant's

subjective claims, and vague testimony as to the alleged disability and symptoms.  <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1040 (9th Cir. 2008).

**<u>Analysis</u>**

Before examining the sufficiency of the ALJ's reasons for discounting Plaintiff's credibility, I must first determine if there was affirmative evidence of malingering that would relieve the ALJ's obligation to provide clear and convincing reasons discounting Plaintiff's credibility.  The ALJ did not make an explicit finding of malingering, and I have found no reference to malingering in the notes of treating or examining physicians.  As noted above, Dr. Rosenbaum, who performed an independent medical examination, did opine that there was a "significant functional overlay" to Plaintiff's complaints of back pain.  In addition, the ALJ asserted that Plaintiff misrepresented and exaggerated her back pain "to obtain excessive narcotics."  However, a "functional overlay" does not necessarily indicate malingering, and the ALJ did not cite any specific examples of Plaintiff's intentional exaggeration of symptoms.  Under these circumstances, I conclude that the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff was not wholly credible.

The ALJ provided several clear and convincing reasons for concluding that Plaintiff was not credible.  He asserted that Plaintiff's activities were inconsistent with her assertions of disability.  He noted that Plaintiff was able to independently care for herself, could prepare meals, needed no reminders to take her medications, was able to do her laundry and shop for her personal items and groceries, could independently handle her finances, watched movies and television, used a computer and socialized daily, could follow written and spoken instructions, and was able to travel during a time she alleged disability.  The record supports the ALJ's assertion that Plaintiff was able to engage in these activities, and they were inconsistent with the

degree of impairment and pain to which she testified.  Accordingly, the cited activities of daily living support an adverse inference as to Plaintiff's credibility.  See, e.g., Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2006) (activities of daily living may discredit claimant to extent are inconsistent with impairment alleged).

The ALJ cited the disparity between Plaintiff's allegations of a worsening spinal condition and the "increasingly infrequent care" she sought for that problem, and the conservative treatment she received for her lumbar spine impairment, as evidence that Plaintiff was not wholly credible.  He noted that Plaintiff last saw Dr. Soldevilla in February, 2008, two and a half years before the hearing, and had not sought care for her cervical spine from her primary care physicians for 22 months.   This observation supported the ALJ's credibility determination, because the amount of treatment a claimant seeks is "an important indicator of the intensity and persistence of . . . symptoms."  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (lack of consistent treatment may support adverse credibility determination).

The ALJ also correctly noted that Plaintiff received only conservative care for her allegedly disabling lumbar spinal impairment, and cited this as evidence that Plaintiff was not wholly credible.  This observation supported the ALJ's credibility determination.  See Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) (citations omitted) (conservative treatment can be sufficient basis to discount claimant's testimony as to severity of symptoms).

The ALJ further supported his credibility determination by noting that, despite her complaints of significant impairment of her lumbar spine, upon examination, the findings concerning Plaintiff's lumbar spine were frequently benign.  That observation is supported by the medical record.  As the Commissioner correctly notes, though an ALJ cannot reject a

claimant's pain testimony solely because it is not supported by the objective medical evidence, medical evidence is a relevant factor in determining the severity of a claimant's pain.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).  Here, the ALJ did not rely only on a lack of supporting objective medical evidence, and set out substantial reasons for concluding that Plaintiff's subjective complaints were not wholly credible in light of the medical evidence.  Under these circumstances, an absence of objective medical evidence supporting Plaintiff's subjective complaints was relevant to the ALJ's credibility determination.

The ALJ provided clear and convincing reasons for concluding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible.

4. **Development of the Record**

Plaintiff contends that the ALJ failed to adequately develop the record because "a plethora of significant evidence relating to Plaintiff's cervical impairment" were not included, few of the documents from her worker's compensation claim were included in the record, Dr. Mitchell's treatment plans for physical therapy and chiropractic care "on several occasions" were not obtained, and records from chiropractic treatment, physical therapy, and a pain clinic were not included.  She also asserts that Dr. Silvestri's treatment records were not included. Plaintiff contends that the ALJ erred in failing to have her previous attorney explain the absence of this evidence, "or to require that the evidence be obtained."  She asserts that the ALJ should have found the existing record was inadequate.

I disagree.  Certainly, even if the claimant is represented, the ALJ has a duty to fully and fairly develop the record and to ensure that a claimant's interests are considered.  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  However, an ALJ is required to further develop the record only if the existing evidence is ambiguous, or if the record is inadequate to allow for

"proper examination of the evidence." Id. Here, the evidence included in the voluminous medical record was not ambiguous, and was adequate to allow for an accurate evaluation of Plaintiff's claims.

## Conclusion

A judgment should be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 25, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 6th day of March, 2013

    /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge